HILL, Respondent, *v.* HALLER, Appellant.

(No. 7,867.)

(Submitted March 14, 1939.  Decided April 27, 1939.)

[90 Pac. (2d) 977.]

*Mr. R. F. Gaines,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. Harrison J. Freebourn, Mr. William Freebourn, Mr. H. L. Maury,* and *Mr. A. G. Shone,* for Respondent, submitted a brief; *Mr. Shone* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an appeal by defendant from a judgment entered on a verdict in favor of plaintiff. The action was one to re-

cover damages for personal injuries sustained by plaintiff as a result of alleged negligence of the defendant in driving an automobile into and against her at a street intersection in Butte. Defendant contends that the evidence submitted by plaintiff was insufficient to justify submission of the case to the jury and to sustain the verdict and judgment. This question was raised by an offered instruction to find for defendant, and by motion for new trial. No motion for nonsuit was made.

Plaintiff's version of the accident was recounted by her as follows:

The collision occurred on West Park Street and at the intersection of that street and Jackson Street. The plaintiff at the time was employed as chambermaid at the Apex Hotel situated on the north side of Park Street, and a few feet east of the intersection of Park and Jackson Streets. She had finished working on September 3, 1936, about 4 o'clock in the afternoon, and intended to ride on a street car to her home. As she came out of the hotel, she said, the street car had come to a stop in front of the hotel east of Jackson Street, with the front end of the street car facing east and the back end at about the east crosswalk of Jackson Street, and that she customarily caught the street car at that point. She was carrying several bundles or packages at the time and proceeded westerly to the east crosswalk of Jackson Street and then proceeded on the crosswalk, intending to pass around the rear of the street car and board it on the south side and near the front end. A number of automobiles were parked in close formation on the north side of Park Street at an angle. The one nearest the Jackson Street crossing was a truck, and it was parked so that both front wheels were slightly west of a line drawn at right angles with the west side of the door to the Apex Hotel. As she was walking on the crosswalk toward the rear of the street car, she said she observed passengers in the process of getting on and off; that when she reached a point within six feet of the street car, she was struck by defendant's automobile which, she said, was traveling at a rate of speed of forty miles per hour, resulting in the injuries of which she complains; that she did not

see the automobile until the moment it struck her; it passed through the space between the street car and the parked automobiles and was traveling westward. She said that the front of the automobile struck her on the left side. All of the injuries were to her left side, and her attending physician gave it as his opinion that the impact came from the left side. Plaintiff testified, and defendant conceded, that the latter did not sound the horn of the automobile or give any warning of its approach at the crossing.

Plaintiff contends that this evidence brought the case within subdivision 4 of section 1743, Revised Codes, reading: "No motor vehicle operating upon a public street or highway of this state shall pass on either side thereof a street-car which has stopped to receive or discharge passengers at a less distance than eight feet, nor at a speed greater than six miles per hour."

Defendant takes the view that this court should disregard plaintiff's evidence. Her counsel contends that the case is·controlled by the case of *Casey* v. *Northern Pac. Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 145, and others of like import. In the *Casey Case* this court said: "Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them."

The reason for the conclusion reached in the *Casey Case* was stated by the court as follows: "In his testimony given upon the trial of this case the plaintiff contradicted himself repeatedly; contradicted the allegations of his verified complaint; was contradicted by his previous statements, by the physical facts, by every one of defendant's witnesses, and by his own witness, Marchington. Some of his declarations are too transparent to be entitled to credence, are improbable upon any supposition short of actual mental imbecility."

Is plaintiff's evidence here open to the objections relied upon in the *Casey Case?* Plaintiff here did not repeatedly or at all contradict herself. She did not contradict the allegations of her complaint. She was not contradicted by previous statements made by her. Her testimony was not in conflict with the physical facts.

While defendant did not so contend, two of the members of this court in the dissenting opinion take the view that it would have been impossible for plaintiff to observe passengers getting on or off the street car from the point where she said she did. Had plaintiff been cross-examined on the point, she doubtless would have explained that she made that deduction from the fact that looking through the windows of the street car she saw people moving to and fro in the aisle. That is a deduction frequently made when people are seen moving to and fro in a standing train or bus.

It is also suggested in the dissenting opinion—and this, too, was not urged by defendant—that, since plaintiff testified that she heard the street car coming up the hill while she was coming down the stairs of the Apex Hotel, her entire testimony should be disregarded because, if the street car was coming up the hill when she was on the stairs, it could not have arrived and stopped at the place where she said it was after she reached the sidewalk in the brief time consumed by her in descending the stairs. As to this it is sufficient to say that at best it was simply her opinion as to where the street car was when she heard it. She doubtless was mistaken in supposing that it was coming up the hill when she heard it; that her guess or opinion in that regard may have been wrong is no reason for condemning all of her testimony. Moreover, where the street car was when she first heard it was a collateral matter and should not be the controlling point in the case. And, too, whether passengers were getting on or off the street car was likewise a collateral matter, admissible to prove that the street car had come to a stop before defendant had come to it, but that was not the only method of proving the fact. The motorman admitted that he stopped the street car intending to receive plaintiff as a passenger. Whether

other passengers got on or off was not vital to plaintiff's right of recovery.

The gist of defendant's contention is that plaintiff's testimony that when the street car was standing in front of the Apex Hotel she walked in a direction away from rather than toward the point at which she could enter the street car, is contrary to the usual propensities of man and the course of human nature, and hence in conflict with the inference that may be drawn (sec. 10603, Rev. Codes) from the undisputed facts. She contends that the universal practice for those seeking transportation on a street car, and where departure is imminent, is to blindly run for the nearest entrance of the street car. If this inference is one that arises ordinarily, there were facts which make it improper to draw that inference here. There were cars parked in close formation in the path that plaintiff would have taken had she desired to travel the shortest route to the street car entrance if the street car was where she said it was, making it impossible, or at least difficult, for her to do so. But, in any event, we cannot say that it is entirely impossible or incredible that plaintiff did as she said.

We find no basis for condemning plaintiff's testimony as unworthy of belief. It is true that on all essential matters it stood practically alone and was disputed by defendant's witnesses, some of whom were disinterested. But that simply presented a situation where there was a conflict in the evidence. Under well-established and familiar rules, where there is a conflict in the evidence the questions are for the jury. The testimony of one witness is sufficient to establish a fact regardless of the number of witnesses testifying to the contrary. (*McQuay* v. *McQuay*, 81 Mont. 311, 263 Pac. 683; *Vesel* v. *Polich Trading Co.*, 96 Mont. 118, 28 Pac. (2d) 858.) The weight of the testimony and the credibility of witnesses is for the jury (sec. 10672, Rev. Codes), which has the advantage of personal observation of the witnesses.

It is contended that plaintiff's testimony that the automobile was traveling forty miles per hour is unbelievable. Evidence of speed, excepting as to one who happens to be watching

the speedometer, is essentially a matter of opinion. Plaintiff might have been mistaken. Defendant admitted that she was traveling eighteen or twenty miles per hour, and this was sufficient proof to establish negligence under subdivision 4 of section 1743, Revised Codes, so far as speed of the automobile was concerned.

Were this court, from the cold record, to determine in this case which of the witnesses told the truth and which did not, then we would be obliged to do so in every case where there is conflicting evidence, and we would retain in form only, but not in fact, what we now call our jury system.

Defendant contends that the court erred in denying her motion for a new trial for insufficiency of the evidence to support the verdict, and that the verdict is against law. She argues that on motion for new trial this court may weigh the evidence. She places reliance upon the case of *Jeffrey* v. *Trouse,* 100 Mont. 538, 50 Pac. (2d) 872. In that case the jury found for defendants, and this court remanded the case for a new trial. It did so, however, because the evidence in behalf of defendants was not consistent with the physical facts. The case came within the principles announced in the *Casey Case*. Because the evidence for defendants was not consistent with the physical facts, there existed no actual conflict in the evidence. The court stated: ''It is the rule that when the record presents a conflict in the evidence resolved by the jury in favor of a party, this court is precluded from disturbing the verdict.'' The plaintiff's evidence here not being inconsistent with the physical facts, and not being improbable or unreasonable, leaves the situation where there is a conflict in the evidence.

This court in a number of cases has held that an inference or presumption fades away in the face of uncontradicted, credible evidence so clear and convincing as to leave but one inference in the minds of reasonable men. (*Monaghan* v. *Standard Motor Co.,* 96 Mont. 165, 29 Pac. (2d) 378; *Nichols* v. *New York Life Ins. Co.,* 88 Mont. 132, 292 Pac. 253; *Pankovich* v. *Little Horn State Bank,* 104 Mont. 394, 66 Pac. (2d) 765.) But here the evidence of defendant's witnesses was not uncontradicted. It

was squarely contradicted by the testimony of plaintiff; and plaintiff's case does not rest upon an inference or presumption, but upon sworn testimony. Someone must pass upon the credibility of the witnesses. That function, under repeated decisions of this court, is for the jury in the first instance. There are cases holding that the trial court may on motion for new trial pass upon the question whether the verdict is against the weight of the evidence, but in those cases it has been held that the question is within the discretion of the trial court which has the advantage of seeing the witnesses and observing their conduct and demeanor, and that this court will not disturb the discretion of the trial court (*Hamilton* v. *Nelson,* 22 Mont. 539, 57 Pac. 146), in the absence of abuse (*Mullen* v. *City of Butte,* 37 Mont. 183, 95 Pac. 597), but will determine whether there is substantial evidence to warrant the verdict, and to warrant the action of the trial court in its ruling on the motion for new trial. (*West* v. *Wilson,* 90 Mont. 522, 4 Pac. (2d) 469.)

On the record we cannot say that there is not substantial evidence to support the jury's verdict and the court's denial of the motion for new trial. The testimony of plaintiff here was not subject to the infirmities pointed out by this court in the cases of *McAllister* v. *McDonald,* 40 Mont. 375, 106 Pac. 882; *First State Bank of Thompson Falls* v. *Larsen,* 65 Mont. 404, 211 Pac. 214; *Whitney* v. *Bertoglio Mercantile Co.,* 65 Mont. 358, 211 Pac. 323; *State* v. *Gunn,* 85 Mont. 553, 281 Pac. 757; *Boepple* v. *Mohalt,* 101 Mont. 417, 54 Pac. (2d) 857, and others relied upon by defendant.

One other point must be considered. Under our statute (subd. 1, sec. 1743, Rev. Codes), it is provided: "At all (turns) curves, corners, and crossings, and particularly where the view is in any manner obstructed both in cities and towns and in the country, vehicles must slow down and be under complete control," etc. The evidence is such that it was a jury question as to whether defendant acted as a reasonably prudent person would have acted under all the circumstances in traveling at the point of collision at the speed of eighteen or twenty miles per hour, as she admitted, even though the street car had not come

to a full stop when defendant met it. At that speed she would travel thirty feet while plaintiff traveled eight or ten. Whether, in the exercise of reasonable care, she should have seen plaintiff in time to avoid the collision, was for the jury.

Defendant complains that the court instructed the jury as ▇ to her duty and liability under section 1743, Revised Codes. Her counsel contends that the complaint is not sufficient to inform her that plaintiff was relying upon section 1743. This contention cannot prevail. The complaint alleged facts sufficient to bring the case within that section.

Other contentions have been considered and found without merit.

The judgment is accordingly affirmed.

Mr. Chief Justice Johnson and Associate Justice Erickson concur.

Mr. Justice Stewart:

I dissent. The actual question for determination is whether plaintiff was run into by the automobile, or the automobile was run into by her. This question in turn involves a consideration of the further question as to whether the street car was stopped to receive or discharge passengers at the time of the collision. Plaintiff's case is based upon defendant's alleged negligence, statutory or otherwise. The statutory traffic regulation relied upon is quoted in the majority opinion.

The testimony offered by plaintiff in her own behalf, through a Finnish interpreter, discloses that she was a chambermaid at the Apex Hotel; that she was leaving the hotel about 4 o'clock in the afternoon and intended to ride on the street car to her home; that she heard the street car come up the hill before she came out of the hotel; that when she came out it had come to a stop in front of the hotel on the east side of Jackson Street; that she customarily caught it at that point; that as she was walking on the crosswalk toward the rear of the street car she observed passengers in the process of getting on and off; that when she reached a point within six feet of the standing street

car she was struck by defendant's automobile; that she did not see the car until the moment it struck her, and that it was traveling at a speed of about forty miles an hour.

Defendant and witnesses in her behalf testified that she was proceeding westerly on Park Street, meeting the approaching street car at a speed of eighteen to twenty miles an hour; that plaintiff hurriedly came running from the hotel; that she crossed the sidewalk in front of the hotel at an angle to a car parked directly in front of the entrance thereto; and that in so doing and without looking for the approach of the automobile which defendant was driving, she walked rapidly, or ran, into some portion of the right side of defendant's automobile, and the injuries resulted to plaintiff because of her own negligent acts.

It is obvious that there exists a sharp conflict in the evidence in a number of material particulars. Ordinarily, in such case, the decision of the trial court is conclusive on us unless the conflict is fanciful only and the decision is one which a reasonable mind, functioning without prejudice, could not have reached. (*Morton* v. *Mooney,* 97 Mont. 1, 33 Pac. (2d) 262; *Koppang* v. *Sevier,* 106 Mont. 79, 75 Pac. (2d) 790, and cases therein cited.) An exception to this rule, also well established in the law, is that the evidence, conceding that it may be contradicted and in conflict, must at least be credible. The usual statement of the rule is: "Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them." (*Casey* v. *Northern Pac. Railway Co.,* 60 Mont. 56, 198 Pac. 141, 145.)

Before discussing the evidence in the light of the rules just mentioned, it is helpful and enlightening to reproduce the plat introduced in evidence by plaintiff and certified here illustrating the physical fact situation allegedly existing at the scene

of the accident.   By appropriate reference thereto there is presented a clearer understanding of the evidence:

**Legend**

A. Hotel Entrance
B. Street Car.
C. Panel Truck
D. Where Defendant Stopped.
E. Apartment Windows.
S. Where Plaintiff was Struck

Plaintiff testified in her own behalf and was the only witness produced on her side to establish her version of the accident. She testified on direct examination as follows: "When I came out of the Apex Hotel door I saw the street car; the street car was standing; it was standing eastward." At this point in her testimony she was requested to place on the plat, Exhibit No. 2, being a piece of paper representing the street car and appearing as letter "B" on the reproduced plat. This she did and placed it on the plat in the asserted position the street car was in when she came out of the hotel. She next testified that she walked to the end of the sidewalk in front of the hotel to point "XO," and then proceeded southward on the crosswalk

to point "S," her intention being to turn behind the street car and enter it at point "XP." She testified: "Well, I came across the street. I was going around the street car and up toward the door that's on the eastern side of the street car. By the eastern side I mean the front side and on the south. As I was crossing from the sidewalk on the north side, where I have marked "X" or "XO," and as I was crossing the street to get onto the street car, a car came and struck me." Plaintiff was given a piece of paper marked Exhibit 3, representing a panel truck, which she placed on the plat as representing the position in which it stood parked as she came out of the hotel. She placed it on the plat marked "C" on plat. Other cars were parked east of "C," but none west. She testified she was unable to see eastward on the street as she proceeded along the crosswalk due to obstructed vision caused by the paneling in the truck "C." She arrived at point "S" she testified, "A car was coming about 40 miles an hour and it hit me. * * * I did not know the automobile was coming from the east at any time before I saw it and just before it struck me. I didn't see it excepting just when it hit me." She said she attempted to step back out of the way, but did not have time; that the defendant did not blow her horn. She testified further: "When the street car was stopped, and as I was walking across the crosswalk, there were passengers getting on or off the street car at that time. Some were going and some were coming, and that was while I was crossing the crosswalk going towards the street car."

On cross-examination she testified: "When I came out of the front door of the Apex Hotel the street car had stopped already. I heard the street car come up the hill when I was inside the hotel, but it had already stopped when I came out of the hotel. I walked fast. I didn't run. * * * When I heard the street car coming up the hill I was coming down the hotel stairs from the sidewalk up to the main floor upstairs. In the Apex Hotel if you go in from the street or sidewalk you walk up a few steps to get to the main floor. I was on those steps when I heard the street car, and when I came down the

stairs the street car had stopped; that was the stairs leading down to the sidewalk. I heard the street car coming while I was on the first floor. I heard a sort of a thunder, which I thought was the street car coming.''

''Q. When you first got off the sidewalk, could you see to the east, the first step off the sidewalk could you see to the east? A. I looked east and west. When I looked east I didn't see anything, then, but I saw it just before it hit me and it was too late then. This truck 'C' just had the window in the front. Because of those solid sides and solid back I couldn't see anything through there. This point over here, 'S,' is the point at which I say I was struck, about six feet from the street car. I couldn't see east until I got to the point where I was struck.''

She testified also on cross-examination: ''While I was walking that way I looked over towards the street car. As to how many people I saw get on the street car, I can't count them. There were many of them though; there were about five or six going,— some were going and some were coming. I mean both the people that were getting on and the people that were getting off''

Having set forth the pertinent portions of plaintiff's testimony, I now proceed to analyze it from the standpoint of inherent probability, having in mind the physical factual situation and plaintiff's sworn testimony. The first set of circumstances created solely by plaintiff's testimony, and which casts doubt upon her statements, has to do with plaintiff's location of the street car, as she emerged from the hotel in the process of catching it.

Reference to her testimony shows that she heard the street car as it came up the hill from the westward while she was in the hotel. She states in one place she was on the main floor and later that she was on the steps leading from the inside to the hotel entrance marked ''A'' on plat. She may have heard it coming when she was in either or both places. There were just a few of such steps. If she heard the car coming up the hill while she was on the stairs, it is not a likely story that in the very next brief moment, as she came onto the sidewalk that it would have stopped in front of the hotel in the process of

discharging and receiving passengers. Such, however, was the case according to her testimony.

Assuming that the street car "B" was as she said, she next walked fast in a westerly direction to point "XO." She stepped from the curb, looked east and west and saw no traffic approaching and proceeded along the crosswalk to the point marked "S." Not until she reached that point, according to her testimony did she have any perceptible vision eastward. While walking from point "XO" to "S" she testified many passengers got on and off the street car "five or six going—some were going and some were coming." To have made such observation it would have been necessary for her to look in the direction of the front end of the street car, more particularly point "XP," located on the opposite side of the car from her position on the crosswalk. If she actually did look in that direction, it seems difficult to believe that she could have seen what she said was transpiring at the street car entrance as she crossed the street. Concededly, she could have seen passengers moving in the street car aisle in the process of leaving, as they most naturally would before the oncoming passengers were received, but how, in the short time transpiring during her fast walk from the hotel to point "S"—a distance of approximately 45 to 50 feet—she could thereafter have observed the oncoming passengers seems fanciful and improbable.

Also, if plaintiff observed passengers getting on and off as she was walking on the crosswalk, she naturally made such observation before she was struck at point "S" and would also have directed her vision eastward, or at least southeastward. In so doing, the closer she approached point "S" the farther eastward could she have seen had she looked. True, if the car were stopped and discharging and receiving passengers, plaintiff would under section 1743, Revised Codes, subdivision 4, have been under no obligation to look eastward because at point "S" she would be within the eight-foot safety zone set up by the statute, and no traffic would be lawfully coming westward past the street car because of the lack of space existing between the street car and truck, "C" (approximately 8 to 8½ feet ac-

cording to the position in which plaintiff placed the panel truck on the plat). But she testified that she did not see defendant's car until just before it struck her, yet if she were looking toward the front of the street car, as was necessary to even have believed she saw passengers leaving and entering, she must also have looked eastward and would likely have seen defendant approaching at least before the instant she was struck.

In this connection plaintiff's testimony is that defendant struck her while driving at a speed of about 40 miles per hour. She testified positively that defendant was traveling that fast— even though she did not see the offending car until practically the instant it struck her. Such ability to judge the speed of a car at such short notice seems incredibile and is a strain upon reason and common sense to the point of fracture. Especially is this true where, as here, the situation presented is that of a person, not standing and waiting to board a street car when it pulled up to the loading zone, and alert to passing traffic, but on the contrary, the often occurring predicament of a person a little behind the street car schedule hastily hurrying to board it and then in the midst of the process suddenly becoming unexpectedly confronted by a passing automobile. In such circumstances to have been able to estimate the speed of the car at 40 miles an hour without having had opportunity to either adequately see or hear it, approaches the phenomenal. The possibilities of the story seem to us to be capable of existence only in the realm of fancy and unreason.

At the outset were reiterated the general rules prevailing in the case of conflicting evidence. Before considering the testimony of defendant and her witnesses, I wish to call attention to the controlling rules which must be borne in mind with relation thereto. It is provided by statute, section 10672, Revised Codes, subdivision 2, that jurors "are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds." From this it follows, and it is so provided by section 10505, Id., that "the direct evidence of one witness who is entitled to full

credit is sufficient for proof of any fact, except perjury and treason." (*In re Silver's Estate,* 98 Mont. 141, 154, 38 Pac. (2d) 277.) Of course, in determining whether a given witness is entitled to full credit, the admonition set forth in section 10672, subdivision 3, providing "that a witness false in one part of his testimony is to be distrusted in others," must necessarily be heeded. (See, also, sec. 10508.)

As before noted, plaintiff was the sole witness in her own behalf in so far as establishing the accident was concerned. Having illustrated that part of her testimony was at least inherently improbable, if not physically impossible, the rule so often announced by this court, that "juries may not arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case," applies with extraordinary force. (*Haddox* v. *Northern Pac. Ry. Co.,* 43 Mont. 8, 113 Pac. 1119, 1122; *Jeffrey* v. *Trouse,* 100 Mont. 538, 50 Pac. (2d) 872, and cases therein cited; and sec. 10672, Rev. Codes, subd. 1.) The application of this rule here becomes particularly significant in view of the fact that plaintiff, an uncorroborated witness, is the party vitally interested in the outcome of the suit and with a natural motive for being biased in her own testimony. Defendant, on the other hand, while equally as anxious to win the lawsuit, and, therefore, subject to the same motive for coloring her testimony if necessary, was corroborated on the controlling issues of fact by five other witnesses, four of whom, ostensibly at least, were disinterested and without an attributable motive for testifying as they did, and being all of the eye-witnesses to the accident that were produced.

Defendant testified that she was proceeding westerly along Park Street and observed the street car coming towards her; that she met it as it was crossing the intersection of Park and Jackson Streets; that she slowed her car down from 20 to 18 miles per hour; that she had no reason to believe that the street car was going to stop as she saw no passengers approaching the street car tracks from either side; that the panel truck "C," was parked farther east than indicated on the plat, and at an angle

which would not put the rear end so far out in the street; that her automobile passed the panel truck and immediately thereafter she heard the noise of an impact against her car and caught the flash of plaintiff out of the corner of her eye as she struck the car; that she came to a stop across the intersection of Park and Jackson Streets at "D"; that she hurried back to plaintiff's side and thereafter took her to the hospital, and thence to her home.

On cross-examination her story was practically the same, although counsel for plaintiff makes much of her statement which she admitted having made in a deposition previously taken to the effect that she slowed her car down so she could go through between the parked car ("C") and the street car. From this it is argued that defendant impeached her prior statement that the street car was moving when she met it. I am not impressed with the suggestion. Regardless of whether the street car was stopped or moving in the vicinity of the panel truck "C," defendant would be faced with going between it and the truck. As she approached the moving street car, there were cars parked at an angle to her right. The street car was approaching and defendant had no warning or intimation that it was going to stop. If it had not stopped, as it will subsequently appear that it did, defendant would in all likelihood have passed through between the street car and the back end of the panel truck. She clarified her deposition statement by testifying at the trial that she anticipated the narrow space there would have been between the panel truck and street car had the latter stopped. She testified that the running board on the driver's side was about six feet from the street car when she passed it.

Witness House, division manager for the Phillip Morris Cigarette Company, was closest to the scene of the accident, he being the driver of the panel truck "C," and in the process of getting in on the driver's side as plaintiff came out of the hotel. He testified in substance that he watched plaintiff as she came from the hotel, and that as she opened the door she started running in the direction of the approaching street car. She ran in front of the truck a few feet at an angle and he

thought she was going to run in front of the moving street car, but at that moment defendant's car passed the back of his truck and plaintiff ran into the side of the passing car as it traveled westward. He was not able to estimate defendant's speed, but said the force of the impact threw plaintiff forward and back towards the sidewalk and caused her to land in a sitting position. His recollection of the position of the street car was that it was moving across the narrow street called Jackson, and that it came to a stop on the crosswalk with its front end some feet east of such walk. He also observed that defendant's car came to a stop just across the intersection parking on Park at point "D." On cross-examination he testified that he picked plaintiff up approximately on the sidewalk four to six feet from the sidewalk curb. He also corroborated defendant in her statement that his truck was parked farther eastward than where plaintiff placed it on the plat, with the front wheels of his truck about opposite the hotel entrance.

Morgan, the street car operator, corroborated witness House and defendant to the effect that the street car was moving as plaintiff ran out of the hotel, and in all other material details. In addition, he testified that he had had no signal from passengers in the car to stop at the intersection, nor did he see any passengers wishing to get on until he observed plaintiff running from the hotel as he was crossing the intersection of Park and Jackson. He recognized her as a regular customer, and immediately threw off the power and prepared to make a stop, which he did, but not at the place indicated by plaintiff on the plat. He testified that he stopped the car at a point where the front end of the street car passed the crosswalk ten to twenty feet leaving part of Jackson Street blocked by the rear end of the car. He also stated that it was the rule and practice of the company for cars going east on Park Street, to stop at the near side crossing—that is, spot the street car steps on the crosswalk. There was some dispute in the record as to this practice and custom at the Park and Jackson intersection.

Lawlor, a passenger on the street car, seated near the motorman was conversing with him at the time of the accident. He corroborated the motorman and defendant's version of the accident as did Emily Trostle, also a passenger on the car, seated near the front end on the north side.

In addition to these eye-witnesses, the defendant's theory of the accident was substantiated by the testimony of a lady occupying an apartment in the Apex Hotel. Her apartment was located in the front end of the hotel at sidewalk level; three of the apartment's windows faced Park Street, their sills being flush with the sidewalk—"E" on plat. She testified that at the time of the accident, she was watering a plant in the window and saw the accident happen as narrated by all of defendant's witnesses.

The testimony of these witnesses stands unimpeached in the record other than by the conflict tendered by plaintiff's story. If passengers were entering and leaving the street car as plaintiff testified they were and the position of the street car was also at a standstill as plaintiff testified, it is improbable that any of the three witnesses on the street car would even have seen the accident. It would have happened behind their backs. The motorman would have been busy with his customers, and to have seen point "S" he, as well as witnesses Lawlor and Trostle would have had to look back over their shoulders or turn around. Having passed point "S," there would have been nothing to even have attracted their attention to the accident. The probabilities of the situation more reasonably indicate that the street car was moving at the time of the accident, that there were no passengers either leaving or boarding the street car, and that plaintiff, the only prospective customer at Park and Jackson, came hurriedly from the hotel, and in her haste, blindly ran into the side of defendant's passing car.

Plaintiff was undisputedly picked up approximately four to six feet from the sidewalk curb, and approximately on the crosswalk by witness House. Referring to the plat, and particularly point "S" where plaintiff claims she was struck by a car speeding forty miles an hour, it is difficult to visualize

the fact that plaintiff could have been so hit, and still be on the crosswalk near the curb when picked up. It seems more logical and reasonable to suppose that under such circumstances she would have been carried forward by the impact into the intersection of Park and Jackson Streets.

Plaintiff's injuries seem all to have been inflicted upon the left side of her body with the exception of the head injury which allegedly came about when her head struck the pavement. Her theory is that she was struck a glancing blow by defendant's right front fender. In that connection, it must be remembered that she testified that she was only six feet from the street car when she was struck (point "S"). The average automobile is almost, if not six feet wide, or wider. Under such circumstances for defendant to have struck plaintiff with her right front fender, she would practically have had to scrape the side of the street car in getting by at all with the left side of her car. No semblance of such evidence is in the record. More reasonably, even under plaintiff's version of the accident, defendant would probably have cleared the side of the street car by at least a foot in which case, the right front fender would easily have been more than six feet at point 'S" from the street car. In that event, plaintiff could hardly have escaped being run over, or at least pushed into the intersection rather than to a point four to six feet from the curb and on the crosswalk.

The evidence, while conflicting, demonstrates conclusively to me that the surrounding circumstances of the case make plaintiff's story highly improbable and incredible, and therefore within the condemnation of the rules set forth in *Casey* v. *Northern Pac. Ry. Co.*, supra. We reiterate the applicable rule therein announced: ''Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such

circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them.'' The facts of that case presented a situation of inherent impossibility, sworn testimony to the contrary notwithstanding. Here, we do not say that the accident as narrated by plaintiff was inherently impossible, but we do say that under the circumstances it was highly *improbable* and *incredible*. Such being the case, the rule above quoted, covering improbable and incredible situations, as well as impossible ones, applies with like force and effect. In that connection, it is interesting to note that the text of the rule laid down in the *Casey Case* was derived from *Groth* v. *Thomann*, 110 Wis. 488, 86 N. W. 178, 181, which was not a case of physical impossibility. The exact language employed there is as follows: ''When physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith.''

Doubt having been cast upon the probability and credibility of plaintiff's testimony, it is my contention that the jury must necessarily have arbitrarily and capriciously disregarded the unimpeached testimony offered in behalf of defendant, or mistakenly have done so, and arrived at its verdict, not upon substantially conflicting evidence, but in disregard of evidence as to which reasonable men could not have reasonably differed or concluded that it established plaintiff's case.

While the extent of plaintiff's injuries do not constitute one of the assignments of error, it is nevertheless interesting to note that the record discloses that such injuries were very largely established by a medical witness, who, in the course of his testimony, put on a demonstration for the benefit of the jury. Plaintiff asserted that certain parts of her body and limbs were without sensitivity or feeling. The medical witness stuck pins into plaintiff at various places on her limbs and body in order to demonstrate the lack of sensitivity and thereby

show injuries which, it was asserted, were the result of the accident.

The judgment should be reversed.

MR. JUSTICE MORRIS:

I concur in the above dissenting opinion by MR. JUSTICE STEWART.

Rehearing denied May 27, 1939. ASSOCIATE JUSTICES STEWART and MORRIS dissenting.